# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 8:05CR132 |
| ) | |
| DARNELL L. RUSSELL, ) | REPORT AND |
| ) | RECOMMENDATION |
| Defendant. ) | |
| ) | |

This case is before the court on the defendant's MOTION TO SUPPRESS (#16). On June 14, 2005 hearing was held, evidence adduced, and the court took the matter under advisement to allow the parties time to file supplemental briefs. The transcript of the hearing (#23) was filed on June 26, 2005. The government's brief was filed July 8, 2005, the defendant's brief was filed July 11, 2005, and the motion was deemed submitted July 11, 2005.

Russell seeks an order suppressing all evidence and statements obtained as a result of his alleged unconstitutional detention on January 31, 2005. He specifically alleges his detention and arrest by officers of the Omaha Police Department occurred without reasonable suspicion or probable cause, in violation of his rights under the Fourth Amendment to the United States Constitution.

## FACTUAL BACKGROUND

After review of the Transcript (#23) and all relevant pleadings, I find that the factual summary set out in the Defendant's Post-Hearing Brief in Support of Motion to Suppress

(#25) is a fair and accurate recitation of the facts, and with the addition of the testimony appearing in bold print and cited to the record, I adopt the following facts:

On January 31, 2005, at 10:30 a.m., a robbery occurred at the 99 Cent Store at 4205 Redman in Omaha, Nebraska. (Tr. 4:9-13). A description of the robber was given to law enforcement and a perimeter was set up to search for the robber. **According to Officer Magett, the robber was described as** a black male, 160-170 pounds, five-foot-eight to five-foot-nine, wearing blue or black jeans, a black jacket, a black mask, and carrying a handgun. (Tr. 20:13-22). **Officer Levora Beaunea testified the dispatcher described the robber as being in his 20s and wearing a wearing a dark-colored sweatshirt hoody. (Tr. 39:10-12).**

A witness followed the robber for a short period of time after the robbery, but discontinued following the robber after he fired shots at the witness' vehicle. (Tr. 4:19-25; 5:1-2). After arriving, the Omaha police set up a perimeter in an attempt to contain the robber. A K-9 unit indicated the robber had moved south toward Fort Street and Browne Street. (Tr. 5:3-22). Officer Magett stationed his cruiser at the southwest corner of Fontenelle Boulevard and Browne Street, approximately six or seven blocks southeast of the 99 Cent Store. (Tr. 6:4-6).

Approximately an hour-and-a-half after the robbery, Officer Magett of the Omaha Police Department encountered the defendant, Mr. Russell. (Tr. 8:15-1 7). Officer Magett saw Mr. Russell walking southbound on Fontenelle Boulevard nearing the intersection of

Fontenelle and Browne. (Tr. 7:11-14). Officer Magett described Mr. Russell as "walking in a fast action," on the west side of Fontenelle Boulevard. (Tr. 8:21-25; 9:1). Officer Magett testified that he decided to stop Mr. Russell because of the "general description of th[e] party and the fact that the party appeared to me to be kind of shifting as he was moving, like away from me instead of — as he initially saw me, instead of continuing to walk straight, he seemed to be shifting toward going toward the street and that's what initially brought my attention to him." (Tr. 7:16-22). Officer Magett also testified that Mr. Russell's "eyes seemed to be shifting. [H]e got the impression that [Mr. Russell] didn't want to have anything to do with the police." (Tr. 9:12-21).

**Officer Magett testified that he "asked the party if he would come over toward my direction." The defendant, in response, "didn't say anything. He just seemed to be leery." (Tr. 9:7-12).** Officer Magett explained that he ultimately called to Mr. Russell to get him to come to where the officer was at the corner of Fontenelle and Browne. (Tr. 9:7). Officer Magett then "physically" went to where Mr. Russell was standing and Mr. Russell went to the southwest corner of the intersection as directed by the officer. (Tr. 12-15). **Officer Magett concluded, because the robbery suspect had been seen with a handgun, because of the way Mr. Russell's eyes looked and because Mr. Russell appeared to walk away, he should secure Mr. Russell for officer safety. (Tr. 10:1-9).** Officer Magett then prepared to cuff Mr. Russell and ordered him to stand still, (Tr. 8-10) although the officer does not remember if he was standing behind Mr. Russell at that time or not. (Tr. 11:12).

While Officer Magett was attempting to handcuff Mr. Russell, Mr. Russell **pushed Magett off** and ran away, resulting in a foot pursuit of two blocks at the most. (Tr. **9:13-16**; 11:3-5; 28:18-20). At the southwest corner of Fontenelle and Browne, where the officer directed Mr. Russell to stand, Mr. Russell dropped a dark blue jacket. (Tr. 45:13-25; 46:1-2). Next to the jacket, another officer, Officer Beaunea, found a handgun, **a Smith and Wesson .22 caliber revolver (Tr. 45:6-46:10)**, and both items were seized. (Tr. 45:19-20).

After the chase, Mr. Russell was arrested and placed in a police cruiser. Officer Schillerberg, the transporting officer, stated that Mr. Russell protested in the cruiser that "he didn't commit any robbery. He was a felon in possession of a handgun, but he certainly didn't commit a robbery or shoot at anybody." (Tr. 60:22-24).

On cross-examination, Officer Magett testified that when he first encountered Mr. Russell, he did not run from the officer, he was simply walking toward the street. (Tr. 26:8-14). Officer Magett also testified that Mr. Russell obeyed the command to stop and followed him to the southwest corner of Fontenelle and Brown. (Tr. 27: 2-7). Mr. Russell remained standing with the officer until he attempted to handcuff Mr. Russell.

Officer Magett agreed that the records available at the suppression hearing showed that on January 31, 2005, Mr. Russell weighed somewhere between 115 to 135 pounds. (Tr. 32: 22-35; 33:1-6). Additionally, Officer Magett agreed that when Mr. Russell was arrested, he was wearing grey jeans, as described in the officer's report. (Tr. 33: 10-13). The officer again stated that Mr. Russell was walking at a fast pace when he first saw Mr. Russell, but

the officer also testified that on January 31, 2005, there was ice and snow on the ground and it was cold outside. (Tr. 34: 3-14). The officer also testified that the coat on the corner of Fontenelle and Brown was the coat Mr. Russell was wearing when the officer commanded Mr. Russell to stop. (Tr. 36: 6-9).

When Mr. Russell testified on his behalf, he described the clothing he was wearing on the day of the robbery. He testified his pants were light gray all over and had a shade of black going through the sides of the pants. (Tr. 73:20-24). He testified he wore a **dark, navy** blue coat, all gray "Jordan" shoes, and a gray baseball cap. (Tr. 73:10-14; **75:21**). **On cross-examination, he admitted he was wearing a hoody under the dark navy blue coat. (Tr. 76:8-14).** Mr. Russell also testified that he is five-feet-six-inches tall and weighs 135 pounds. (Tr. 74:21-24).

Mr. Russell also explained what happened right before he ran from the area of Fontenelle and Brown:

> I was walking across the street, and I seen a police car coming down flying so I stopped to wait for the car to stop or to see if he was going to keep going, but once he stopped, I continued to walk across the street, and that's when Officer Magett, he hopped out and was asking me come here, and I walked back towards him, and then that's when he got — started to pat search me. He said, I need to search you for a gun. I said, Hold on sir, I know my rights. What is this for? And then that's when I took off.

(Tr. 79:17-25; 80: 1-2). Mr. Russell also stated that when he was commanded to stop by Officer Magett, he did so, and that when the officer began to search him, he followed the officer's directions regarding where to stand. (Tr. 82:13-20).

## LEGAL ANALYSIS

Defendant contends a *Terry* analysis[1] should be applied in this instance. He argues that Officer Magett lacked reasonable suspicion to conduct a *Terry* stop because he did not fit the description of the robbery suspect and his behavior, i.e., walking quickly and avoiding eye contact with Magett, did not provide any basis for suspicion of criminal activity. Had the defendant not been stopped, he would not have shed his coat (and weapon) and fled; his actions were the direct result of the officer telling him he intended to conduct a pat down search. Since the initial stop was unlawful, and any "abandonment" of the coat and weapon cannot be the product of unlawful police conduct, all resulting evidence and statements should be suppressed.

The government argues that a *Terry* stop was appropriate, as the defendant generally matched the description of the armed robber, exhibited subtly evasive behavior when he saw Officer Magett, and was walking in an area where the robber was thought to be headed. The government further argues that defendant abandoned the firearm and its existence was not known by the police until after it was abandoned; its discovery was the fruit of the abandonment, not of the *Terry* stop. Accordingly, the defendant lacks standing to contest the seizure of the gun. Finally, the defendant's statements, while made in police custody, were not the product of interrogation.

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

### A. The *Terry* Stop

Unquestionably the defendant was entitled to the protection of the Fourth Amendment as he walked down the street. *See Terry*, 392 U.S. at 9. As in *Terry*, "[t]he question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure," *id.*, or, in other words, whether it was unreasonable for the officers to seize the defendant and subject him to a limited search for weapons without probable cause for an arrest. *See id*. at 15.

In determining whether the seizure and search were "unreasonable," the court must conduct a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id*. at 18-19. The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.

As the *Terry* Court observed, "Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry v. Ohio*, 392 U.S. at 23. "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." *Id.* at 24. "The officer need not be absolutely

certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27.

In determining whether Officer Magett's was justified at its inception, I note that the level of suspicion required for a *Terry* stop is far less demanding than that for probable cause. *See United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000). "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1999). In *United States v. Arvizu*, 534 U.S. 266, 273 (2002), the Supreme Court stressed that reviewing courts must look at "the totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. "This process allows officers to drawn on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* To justify a *Terry* stop, the likelihood of criminal activity need not rise to the level required for probable cause, ***and it falls considerably short of satisfying a preponderance of the evidence standard***. *Id.* at 274 (emphasis added); *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's

presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir.), *cert. denied*, 516 U.S. 872 (1995).

On January 31, 2005, Officer Magett was helping look for the man who robbed the 99 Cent Store. Police surveillance and the use of a drug dog indicated that this individual was in the area where Magett was stationed and where the defendant was observed. The robber had been described as a black male, in his 20s, 160-170 pounds, five-foot-eight to five-foot-nine, wearing blue or black jeans and a black jacket with a "hoody." On the day in question, the five-foot-six defendant weighed about 135 pounds and was wearing grey jeans and a navy blue coat. Officer Magett testified, credibly, that he noticed the defendant because he generally matched the description of the armed robber and because it appeared that the defendant was trying to avoid Magett. Officer Magett also acknowledged that defendant obeyed his "command" to stop[2] and followed Magett to the southwest corner of Fontenelle and Brown.

While there are discrepancies as to height and weight, the defendant's clothing did generally match the description of the robber's clothing. The defendant was wearing both a coat and a sweatshirt, which would make him appear heavier than he really was. The robber had fired four shots at the witness who followed him after the robbery. In light of his

---

[2]Because Officer Magett acknowledged that he had issued a "command," it does not appear that this contact was consensual.

experience as a police officer, Magett found it significant that the defendant appeared to be trying to avoid him.

A finding of reasonable suspicion may be supported by information that falls considerably short of satisfying even a preponderance of the evidence standard. Considering the totality of the circumstances, and acknowledging that police officers may draw on their own experience and training to make inferences from and deductions about information available to them that might not be significant to an untrained person, I find that it was reasonable for Officer Magett to command the defendant to stop and to subject him to a limited search for weapons without probable cause for an arrest. Magett, however, was unable to complete a typical *Terry* stop because the defendant ran from the scene.

### B. The Firearm

After Officer Magett announced his intention to pat-search the defendant for weapons, the defendant pushed Magett away and fled. As he ran away, the defendant removed his outer jacket and threw it to the ground near the southwest corner of Fontenelle and Browne. He fled east across Fontenelle Boulevard and tried to scale a chain link fence. He was captured by other officers shortly after his hooded sweatshirt got caught in the fence. Officer Beaunea testified she went to secure Magett's cruiser and discovered the jacket, a small amount of crack cocaine, and a handgun lying in close proximity to each other on the ground at the southwest corner of Fontenelle and Browne. A cell phone was later found in the pocket of the jacket. (Tr. 45:13-47:6).

I find that these items were abandoned. Whether an abandonment has occurred is determined on the basis of the objective facts available to the investigating officers. *United States v. Tugwell*, 125 F.3d 600, 602 (1997), *cert. denied*, 522 U.S. 1061 (1998). The determination of abandonment "'is to be made in light of the totality of the circumstances, and two important factors are denial of ownership and physical relinquishment of the property.'" *Id.* (quoting *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986)). "A warrantless search of abandoned property does not implicate the Fourth Amendment, for any expectation of privacy in the item searched is forfeited upon its abandonment." *United States v. Tugwell*, 125 F.3d at 602; *accord United States v. James*, 353 F.3d 606, 615-16 (8th Cir. 2003).

Based on the totality of the circumstances, I conclude that defendant's actions were inconsistent with a continued expectation of privacy in the items he left on the ground, and that all the items were abandoned. *See Tugwell*, 125 F.3d at 603.

### C. Defendant's Statements

The defendant was arrested for "obstruction" after his scuffle with Officer Magett. (Tr. 63:11-18). He was placed in the patrol car of Officer Jill Schillerberg to be taken first to the 99 Cent Store and then to Central Station, (Tr. 60:5-12), and had not been given his *Miranda* rights because nobody was questioning him at that time. (Tr. 63:19-25). She personally did not tell defendant what he was charged with, although other officers "may have said it was regarding the robbery at the 99 Cent Store." (Tr. 61:12-13). Schillerberg

credibly testified that she did not talk to the defendant except to advise him that she was transporting him from one place to the other. (Tr. 61:5-6). Her radio transmissions to the dispatcher were along the lines of "I'm transporting a male party to such-and-such address, beginning mileage and then give the ending mileage." (Tr. 65:1-3). Schillerberg testified that the defendant "simply stated to me that he didn't commit any robbery. He was a felon in possession of a handgun, but he certainly didn't commit a robbery or shoot at anybody." (Tr. 60:22-24). She stated on direct examination that she did not ask him any questions that prompted these statements. (Tr. 61:3-4). Defendant was in Schillerberg's patrol car for about 20 minutes. (Tr. 64:3).

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), "are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996) (parallel citations omitted).

In the case at bar, the defendant was undoubtedly "in custody" when he made statements in the police cruiser. There is no evidence, however, that he was "interrogated" by Officer Schillerberg or that any officer said anything to the defendant to elicit the incriminating statements. There is no evidence that the statements were induced by any kind

of police misconduct. I find that the statements made by defendant in the patrol car were volunteered and were not the product of "interrogation."

## RECOMMENDATION

In summary, I find that Officer Magett had reasonable suspicion to detain the defendant pursuant to *Terry v. Ohio*. The defendant abandoned the coat, handgun and crack cocaine when he threw them to the ground and fled from Officer Magett. His statements made in the police cruiser were not the product of police interrogation.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#16) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED August 10, 2005.**

                                            **BY THE COURT:**

                                            **s/ F.A. Gossett**
                                            **United States Magistrate Judge**